UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TCB REMARKETING, LLC,

                           Plaintiff,                      Case Number 20-10626

v.                                                       Honorable David M. Lawson

METRO AUTO AUCTION, LLC,

                           Defendant and
                           Third-party Plaintiff,

v.

ARMOND VERDONE, JR. and
VERDONE MOTORS, LLC,

                           Third-party defendants.

_____/

## OPINION AND ORDER GRANTING IN PART MOTION TO DISMISS OR TRANSFER VENUE, AND TRANSFERRING VENUE TO THE DISTRICT OF ARIZONA

Plaintiff TCB Remarketing, LLC buys and sells used vehicles in large volumes.  Defendant Metro Auto Auction, LLC, as its name implies, runs an auction facility in Phoenix, Arizona.  TCB alleges in its complaint that Metro failed to remit the proceeds for 14 trucks that TCB sold to a customer — third-party defendant Verdone Motors, LLC — via Metro.  Metro has filed a motion to dismiss for want of personal jurisdiction and a motion to transfer venue to the District of Arizona.  The plaintiff has not shown that the defendant is subject to general personal jurisdiction in this district, and it has not shown that the defendant has sufficient minimum contacts in Michigan to support the exercise of limited personal jurisdiction.  However, under 28 U.S.C. § 1631, transfer, rather than dismissal, is the preferred remedy when a district court lacks personal jurisdiction over a defendant.  Because personal jurisdiction over the defendant can be found in

Arizona, the Court will transfer this case to the United States District Court for the District of Arizona.

I.

The following facts are taken from an affidavit by the plaintiff's principal, John G. Cooper, which was submitted in support of the answer in opposition to the motion to dismiss. The affidavit expands on the jurisdictional allegations in the complaint.

Cooper is a "lifelong resident" of Michigan and the owner of TCB Remarketing, LLC, which has its primary place of business in Flint, Michigan. TCB is a "vehicle remarketer." It buys fleet vehicles that have reached the end of their useful commercial life for resale to potential buyers. TCB's inventory largely consists of Ford F-150 trucks that originally were made in Dearborn, Michigan, but which are acquired by TCB from their former owners around the United States, Canada, and Mexico. Cooper also owns SOHC Motors, LLC, which is an auto dealership in Flint that serves as a channel for acquiring cars from other dealers for remarketing through TCB.

According to Cooper, defendant Metro operates an auto auction facility in Phoenix, Arizona. Metro holds a formal auction one day each week. It also facilitates direct dealer-to-dealer sales, which are conducted on other non-auction days, and are known as "off-the-block" ("OTB") transactions. The focus of the dispute in this case is a series of OTB transactions with a single customer, Verdone Motors, LLC.

Cooper asserts that since approximately 2016, Metro has handled "millions of dollars in OTB sales for TCB." "Many of these sales were arranged . . . by Metro through its largest customer Verdone Motors, LLC [] owned by one Armand Verdone." Johnny G. Cooper aff. ¶ 11, ECF No. 19-2, PageID.330. TCB issued invoices for vehicles that it sold to Verdone via Metro. Those invoices were addressed to Verdone, but "payment for all of the vehicles reflected in the invoices was made by Metro, who then passed certain charges on to Verdone." *Id.* ¶ 14. Cooper estimate[d]

that between 2016 and the end of 2019, he "moved between 500 to 1,000 vehicles per year through Metro, valued between $15,000,000 to $30,000,000." *Id.* ¶ 33.  He also stated that a subset of this business included the transaction of "hundreds of on-the-block and OTB sales" that TCB brokered on behalf of several large car dealerships in Canada, where TCB acted as an intermediary by importing the vehicles from Canada to Michigan, converting the odometers from kilometers to miles, then transporting them on to Arizona for sale through Metro.

Cooper attested that Metro acted as a "fiduciary" for all of the above-described transactions, which involved receiving the vehicles and "pre-endorsed" titles from TCB, to be "held in trust" pending the sale to Verdone, then collecting payment from Verdone, "process[ing] the title paperwork," delivering the executed titles to Verdone, and remitting the purchase price to TCB.

The dispute in this case arises from the sale of 14 vehicles to Verdone and brokered by Metro.  TCB alleges that Metro received and delivered the trucks and titles to Verdone and collected payment for them.  However, Metro never remitted the sale proceeds to TCB.  Cooper alleges that, rather than passing those funds on to TCB as required under the brokering arrangement, Metro instead kept the money for itself and applied the funds to offset Verdone's debt under a financing arrangement that Metro had extended to Verdone to facilitate boosting Verdone's sales volume (in order, allegedly, to further Metro's interest in increasing its own transaction volume, and, thus, commissions earned).

In a supplemental brief, the plaintiff supplied excerpts of testimony by Armand Verdone, Jr., principal of third-party defendant Verdone Motors, LLC, which was taken in July 2019 during a separate state court litigation between Metro and Verdone in Arizona.  Verdone testified that he bought around 50 vehicles from TCB and John Cooper in 2018 and 2019, and that all of those

transactions were processed as "off-the-block" sales through Metro.  Verdone testified that Cooper would contact him regularly and offer to sell several cars each week.  Verdone said he had met Cooper through an introduction via Metro.

Verdone also testified extensively about the relationship that he had with Metro, for which he was the single largest broker selling cars through the auction business, and from which he received extensive accommodations including office space, services of Metro's employees, and an open-ended financing arrangement to facilitate his transaction volume.  Virtually all of the vehicle sales that he brokered went through Metro.  Several employees of Metro worked for Verdone's company during off hours, including a specialist who endorsed titles for transfer, and a bookkeeper who handled banking for Verdone.  Verdone also had an office set aside for his use on Metro's premises in Phoenix where equipment was kept such as a laptop dedicated to handling banking transactions.  The Metro employees who were assigned to conduct business for Verdone had been given powers of attorney from Verdone so they could sign titles, checks, and other paperwork in his name.  The services of Metro's employees and use of its office space were arranged with express consent by Metro.  Verdone also stated that "everyone" at Metro knew about the servicing of his business by its employees, and that Verdone Motors had no employees of its own.

Early on in his relationship with Metro, since at least 2007, Verdone also had entered into an arrangement whereby he would write checks for the purchase of cars that he did not yet have buyers for and deliver those checks to Metro so that transfers of title could occur.  Metro agreed to hold the checks and not deposit them until Verdone had received payment from a buyer and he informed Metro that the checks were "good."  Metro was willing to extend credit to Verdone because it had aggressively encouraged him to boost sales volume, including to cover some occasions where it requested, and Verdone agreed, that he would buy out consignments of vehicles

that had been sent to Metro by commercial fleet sellers, but the cars had failed to sell at auction. Verdone attested that he was by far Metro's largest customer, and that Metro made around $2.6 million in profits from his sales based on reconditioning fees and commissions.

The plaintiff filed its complaint in this case on March 9, 2020, to collect from Metro the withheld proceeds of the sale of 14 trucks to Verdone.  TCB pleads state law claims for breach of contract, breaches of bailment and fiduciary obligations, unjust enrichment, and conversion, and it seeks collection of more than $580,000 in sale proceeds allegedly wrongfully withheld.  Metro filed its motion to dismiss, followed later by a motion to transfer venue.  It also filed a third-party complaint against Verdone Motors, LLC and Armand Verdone, Jr., both of which are in default.

## II.

Metro seeks dismissal of the complaint, arguing that it has no presence or contacts in Michigan, and therefore this Court has no personal jurisdiction over it.  It asserts that it is a Delaware LLC with its principal place of business in Arizona, that it has no place of business or employees in Michigan, and that there are no other facts (either alleged or in reality) sufficient to show that it is "at home" in Michigan.  It also contends that the complaint describes a relationship with the plaintiff in which TCB reached out into Arizona to conduct business with Metro (not the other way around), which did not result in any contacts with Michigan that could support purposeful availment by Metro of the privilege of transacting business in this forum.  In a separate motion, Metro argues in the alternative that the case, if not dismissed, should be transferred to the District of Arizona under 28 U.S.C. § 1406(a).

When personal jurisdiction is challenged in a motion filed under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing the Court's authority to proceed against the defendant.  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing

*McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168 (6th Cir. 1988); *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974)).  That burden, however, shifts.  "The plaintiff must first make a *prima facie* case, which can be done merely through the complaint.  The burden then shifts to the defendant, whose motion to dismiss must be properly supported with evidence. Once the defendant has met the burden, it returns to the plaintiff, who may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (citations and quotations omitted).

The Court can look to a number of sources for the pertinent information: pleadings, affidavits, declarations, or testimony from an evidentiary hearing.  *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017) (quoting *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017)).  But unless the Court holds an evidentiary hearing, "a plaintiff need only make a *prima facie* showing that defendants are subject to personal jurisdiction."  *Genetic Veterinary Scis., Inc. v. LABOKLIN GmbH & Co. KG*, 933 F.3d 1302, 1309 (Fed. Cir. 2019).  The Court must view the pleadings and affidavits in the light most favorable to the plaintiff, *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721-22 (6th Cir. 2000), and it must not consider facts proffered by the defendant that conflict with those offered by the plaintiff, *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).  Making the *prima facie* case for jurisdiction requires "establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction."  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).

When a federal court's subject matter jurisdiction is based on diversity of citizenship, personal jurisdiction is governed by the law of the forum state, tempered by the requirements of the Fourteenth Amendment's Due Process Clause.  *Malone v. Stanley Black & Decker, Inc.*, 965

F.3d 499, 502 (6th Cir. 2020) (quoting *Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997)).   That brings us to Michigan's so-called Long Arm statute, which describes both general personal jurisdiction and limited, or case-specific, jurisdiction.   *See* Mich. Comp. Laws §§ 600.701, 600.711, 600.705, and 600.715.   It is undisputed that general personal jurisdiction does not apply in this case.

The Michigan statute lays out the broad adjudicatory reach of Michigan courts exercising case-specific jurisdiction.   But "[t]he Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014).   Michigan courts have interpreted the State's Long Arm Statute to allow personal jurisdiction to extend to the limits imposed by the federal constitution.   *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992). So, in this instance, "the two questions become one." *MAG IAS Holdings*, 854 F.3d at 899 (quoting *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016)).

"'Specific' or 'case-linked' jurisdiction depends on an affiliation between the forum and the underlying controversy." *Walden*, 571 U.S. at 283 n.6 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).   To satisfy the Due Process Clause, the Court must find that "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Id.* at 284.   "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 582 U.S. ---, 137 S. Ct. 1773, 1780 (2017) (quoting *Goodyear*, 564 U.S. at 919).   The Sixth Circuit historically has applied three criteria to

guide the minimum contacts analysis, which it enunciated in *Southern Machine Company, Inc. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine*, 401 F.3d at 381.

The dispute here centers on the first element of that test. "The Supreme Court has said that purposeful availment exists if the defendant created a 'substantial connection' with the forum state by engaging in 'significant activities within [the] State,' or by creating 'continuing obligations' to residents in that state." *MAG IAS Holdings*, 854 F.3d at 900 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)). The Sixth Circuit has "extended this to business relationships 'intended to be ongoing in nature.'" *Ibid.* (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996)). However, "[t]he Supreme Court has also clarified that although 'a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties,' a relationship with the plaintiff or a third party, 'standing alone, is an insufficient basis for jurisdiction.'" *Ibid.* (quoting *Walden*, 134 S. Ct. at 1123). "Instead, the focus is on 'the defendant's contacts with the forum State itself.'" *Ibid.*

TCB contends that sufficient minimum contacts have been established through the parties' broker-dealer relationship, which allegedly comprised "a years-long course of dealing involving the sourcing, transportation and sale of nearly 1,000 vehicles worth $30 million by a Michigan resident to a company whose business model depends on its ability to source as many vehicles from as many places as possible." It believes that "the overall course of dealing subjects Metro to personal jurisdiction in Michigan," and it relies mainly on the Sixth Circuit's decision in *Air*

*Products & Controls, Inc. v. Safetech International, Inc.*, 503 F.3d 544 (6th Cir. 2007). In that case, the Sixth Circuit held that purposeful availment was established by the defendant's entry into a "business relationship with Air Products lasting almost nine years in which [the defendant] purchased goods cumulatively worth hundreds of thousands of dollars." *Id.* at 551. TCB's secondary argument references the interrelationship between the Metro and Verdone entities and posits that the exercise of jurisdiction is reasonable on an agency theory, where Verdone acted as Metro's agent, and its contacts consisting of its numerous purchases of vehicles from the plaintiff may be imputed to Metro.

Metro pushes back with substantial supplemental materials that, it believes, contradict certain factual assertions by the plaintiff, such as that a contract existed between the parties or that the defendant had any involvement in the sales at issue. Those materials are irrelevant at this stage of the case. *Malone*, 965 F.3d at 505. The Court has elected to rely solely on the ample — and dispositive — documentary record presented, which it must view in the light most favorable to the plaintiff, and it may not credit facts proffered by the defendant that contradict those which adequately are supported by the plaintiff's evidentiary presentation. *Calphalon*, 228 F.3d at 721-22; *Bird*, 289 F.3d at 871.

But even from that viewpoint, the information submitted by TCB fails to make out a persuasive case that Metro (or, by proxy, the third-party defendants) engaged in any conduct intended by either of them to procure some lasting advantageous relationship with the State of Michigan. TCB has not established the presence of sufficient minimum contacts by either defendant entity, considered alone or together, and nothing in the record presented suggests that it has any prospect of reaching an adequate showing regardless of any allowance for further discovery.

Metro insists, and it appears to be undisputed, that it has no operational presence within the state of Michigan.  That fact is relevant but not dispositive.  The defendant's physical presence within the jurisdiction is not a necessary condition for personal jurisdiction, but "the nonresident generally must have 'certain minimum contacts' such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Walden*, 134 S. Ct. at 1121 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

TCB's presentation focuses on the multi-year, high-volume business relationship that it had with Metro's auction and broker operation.  The *Air Products* case, which upheld personal jurisdiction over an out-of-state defendant in a lengthy, large-volume business relationship with the plaintiff, is distinguishable in one crucial respect.  In *Air Products*, it was the defendant who initiated the relationship by "reach[ing] out beyond Kansas' borders to conduct business with a company whose principal place of business it knew to be in Michigan."  503 F.3d at 551.  It maintained that relationship by contacting the plaintiff "in Michigan on approximately several hundred occasions through telephone, email, facsimile, and ordinary mail correspondence for purposes of discussing and placing orders for goods."  *Ibid.*  Because it was *the defendant* that engaged in those actions, the court was able to find that "[s]uch contacts are not 'random,' 'fortuitous,' or 'attenuated,' but are the result of deliberate conduct that amounts to purposeful availment."  *Ibid.*

In this case, there is no information anywhere in the record suggesting that either Metro or Verdone had any role in instigating, initiating, or soliciting the transactions with the plaintiff in which either or both of them were involved.  Nothing in the record suggests that Metro initiated any of the transactions by reaching out in any way to the plaintiff.  Even assuming that Verdone's conduct could be imputed to Metro on some theory of agency — for which the plaintiff has made

a convincingly colorable presentation — the only information in the record affirmatively suggests that all of the 50 or more transactions with Verdone in 2018 and 2019 were instigated by the plaintiff, not by either Metro or Verdone, regardless of the participation of the defendant entities in their completion.  Armand Verdone dep., ECF No. 36-2, PageID.786-87 ("Q. What was your business relationship with John Cooper in 2018. A. John is a dealer. I was a dealer. And *he would call me and offer me roughly three to five cars per month* that he would buy in Canada, *ask me if I wanted to buy them*, and then he would sell them.") (emphasis added); *id.* at PageID.792-93 ("Q. And how many vehicles do you believe that related to John Cooper went through Metro Auto Auction in 2018 and 2019? . . . . A. Off the block, if you're talking about just direct to me, maybe 50.").  The plaintiff contends that it should be allowed further discovery to bolster its agency theory and allow it to establish a more persuasive basis for imputing Verdone's conduct to Metro.  But even if an overwhelmingly persuasive case on that point could be made, nothing in the record suggests even remotely the prospect of any showing that either Metro or Verdone could be found to be the prime movers or instigators of any of the subject transactions.  Moreover, there is no good reason to expect that any further discovery might turn up such evidence, since, if it existed, the information about who initiated any of the transactions or reached out to negotiate any relationship in the first instance certainly would be well familiar to the plaintiff itself and its principal John Cooper.  Yet no evidence of any initiating overtures or negotiations or solicitation to enter into any relationship has been proffered.  There is no good reason to expect that anything more will be forthcoming.

Of course, "purposeful availment" may be shown "if the defendant created a 'substantial connection' with the forum state by engaging in 'significant activities within [the] State,' or by creating 'continuing obligations' to residents in that state."  *MAG IAS Holdings*, 854 F.3d at 900

(quoting *Burger King*, 471 U.S. at 475-76).  And the Sixth Circuit has, in some instances, found this principle applicable to "business relationships 'intended to be ongoing in nature.'"  *Ibid.* (quoting *CompuServe*, 89 F.3d at 1265).  But, as noted earlier, "[t]he Supreme Court has also clarified that although 'a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties,' *a relationship with the plaintiff* or a third party, '*standing alone, is an insufficient basis for jurisdiction*.'"  *Ibid.* (quoting *Walden*, 134 S.Ct. at 1123) (emphasis added).  TCB has made a convincing presentation suggesting that it had an ongoing substantial business relationship with Metro and its alleged proxy Verdone, but nothing more has been demonstrated.  That is not enough, because "*the focus* is on '*the defendant's contacts with the forum State itself*.'"  *Ibid.* (emphasis added).  The plaintiff has offered nothing that suggests that either Metro or Verdone on their own initiative reached out into Michigan in an attempt to establish any lasting foothold in commerce here.  *See Davis v. Alcoa, Inc.*, No. 17-13658, 2018 WL 8815626, at *8 (E.D. Mich. Nov. 14, 2018).

Other cases TCB cites in which personal jurisdiction was upheld are distinguishable.  In *CompuServe*, the record showed that the defendant software developer had reached out of his home state and engaged the services of plaintiff CompuServe's Ohio-centered internet distribution network to market his wares.  *CompuServe*, 89 F.3d at 1263 ("We conclude that *Patterson has knowingly made an effort* — and, in fact, purposefully contracted — *to market a product in other states, with Ohio-based CompuServe operating, in effect, as his distribution center*. Thus, it is reasonable to subject Patterson to suit in Ohio, the state which is home to the computer network service he chose to employ.") (emphasis added).  The facts here — the mirror image of those in *CompuServe* — amply suggest that the plaintiff actively engaged on its own initiative in an ongoing series of transactions with the defendant to market his inventory of commercial vehicles

for resale via their auction and distribution facilities.  That would make for a very convincing showing that the *plaintiff* is subject to the power of an *Arizona* court; but it does not make for a persuasive showing at all on the converse proposition urged by the plaintiff.

In *Burger King*, the Supreme Court squarely held that mere entry into a contractual relationship with a domiciliary of the forum cannot suffice to establish minimum contacts.  *Burger King*, 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").  In this case, the record suggests that any performance called for by Metro entirely was anticipated to occur in Arizona, where the vehicles were sent and from whence they evidently were conveyed for further sale.  Nothing in the record suggests that the parties contemplated or that Metro or Verdone solicited any ongoing performance of the arrangement within Michigan.  *See Conn Appliances, Inc. v. Williams*, 936 F.3d 345, 348 (5th Cir. 2019) ("Other than the fact that Williams entered into a contract with a Texas entity, there is no evidence in the record that Williams engaged with the Texas forum. . . . [A] defendant does not have minimum contacts with a state when it does not have a physical presence in the state, it did not conduct business in the state, and the contract underlying the business transaction was not signed in the state and did not call for performance in the state.") (citations and quotations omitted).

The Sixth Circuit consistently has held that "something more" than mere awareness by an interstate commercial enterprise that its dealings could involve counterparties in remote states must be shown to establish purposeful availment, referring to this as the "stream of commerce plus" approach.  *Parker v. Winwood*, 938 F.3d 833 (6th Cir. 2019).  The plaintiff here contends that Metro's "business model" depended on attracting resale transactions from as many sources as possible in every state.  But it has not shown that either Metro or Verdone engaged in any course

of action deliberately intended by them to solicit delivery of automobiles from brokers specifically located in Michigan, despite the uncontroverted proof that they accepted such transactions when offered.  Regardless of any imputed "nationwide ambitions" of Metro or its proxy Verdone, the generalized awareness of the potential scope of their distribution network is not sufficient to show purposeful availment of the Michigan forum.  *Id.* at 841.

Because the plaintiff has failed to make out a convincing *prima facie* case on the purposeful availment prong, it is unnecessary to address the second or third elements of the *Southern Machine* analysis.  *Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 649 (6th Cir. 2016) ("*Southern Machine*'s first prong, 'purposeful availment,' is essential to a finding of personal jurisdiction.") (quotations omitted).

The defendant separately filed a motion for transfer of the case to Arizona under 28 U.S.C. § 1404(a).  That provision, however, is inapposite because a transfer on the basis of inconvenient forum may not be granted where the Court lacks personal jurisdiction to hear the case in the first instance.  . *Jackson v. L & F Martin Landscape*, 421 F. App'x 482, 483 (6th Cir. 2009) ("A transfer under section 1404(a) may not be granted when the district court does not have personal jurisdiction over the defendants.") (citations and quotations omitted).  Metro's motion to transfer the case for the convenience of the parties and witnesses therefore must be denied.

The defendant also included in its motion to dismiss a request in the alternative for transfer under 28 U.S.C. § 1406(a).  That provision does permit a transfer where personal jurisdiction may not lie in the originating forum.  *Jackson*, 421 F. App'x at 483("[S]ection 1406 applies to actions that are brought in an impermissible forum; the district court need not have personal jurisdiction over defendants before transferring pursuant to this section.").  However, a more pertinent provision is 28 U.S.C. § 1631, which expressly provides that "when the court 'finds that there is a

want of jurisdiction,' it 'shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought.'"  *Ibid.* (quoting 28 U.S.C. § 1631). Although transfer is the preferred remedy, a court may elect "'to dismiss an action rather than transferring it under § 1631 either because (1) no permissible federal court would have jurisdiction over the action, or because (2) transfer would not be in the interest of justice.'"  *Ibid.* (quoting *Roman v. Ashcroft*, 340 F.3d 314, 328 (6th Cir. 2003)).  Transfer may be particularly favored where dismissal could trigger time bar concerns, and the Sixth Circuit has observed that a district court is obligated to consider a request for transfer if one is made as an alternative to dismissal, and to make a finding that the interests of justice would not be served by transfer before declining that option. *Ibid.*

Metro concedes that it could have no jurisdictional objection to defending this case in the District of Arizona, and, although the issue was not thoroughly briefed by the parties, the prevailing circuit law favors transfer for want of jurisdiction under 28 U.S.C. § 1631 as an alternative to outright dismissal, to foreclose any latent concerns about obstacles to further adjudication.

III.

Plaintiff TCB Remarketing has not shown that the exercise of personal jurisdiction by this Court over defendant Metro Auto Auction is proper.  However, transfer for want of jurisdiction under 28 U.S.C. § 1631 (but *not* under 28 U.S.C. § 1404) is an authorized and appropriate remedy under the circumstances.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for want of personal jurisdiction (ECF No. 9) is **GRANTED IN PART**.

It is further **ORDERED** that the Clerk of Court shall **TRANSFER** this case to the United States District Court for the District of Arizona under 28 U.S.C. § 1631.

It is further **ORDERED** that the defendant's motion to transfer venue (ECF No. 15) is

**DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 16, 2020